**ESTATE of Sydney J. CARTER, Deceased (a/k/a Sydney J. Canter), et al., Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 40, Docket 71-1201.**

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1971.

Decided Dec. 14, 1971.

**62**

Michael S. Feinman, New York City, Stuart M. Berkman, New York City, of counsel, for appellants.

William M. Brown, Jr., Washington, D. C. (Meyer Rothwacks, Elmer J. Kelsey, Attys., Tax Division, Department of Justice, Washington, D. C., and Johnnie M. Walters, Asst. Atty. Gen., of counsel), for appellee.

Before FRIENDLY, Chief Judge, FEINBERG, Circuit Judge, and DAVIS, Associate Judge.*

FRIENDLY, Chief Judge:

The taxpayers' appeal from a judgment of the Tax Court, 29 CCH Tax Ct.Mem. 1407 (1970), raises the frequently litigated question whether payments by an employer to the widow of a deceased employee constituted compensation to the latter, includible as gross income under I.R.C. § 61(a), or a gift to the survivor, excludible under § 102(a).

Sydney J. Carter had been employed by the New York City financial house of Salomon Bros. & Hutzler ("Salomon Bros.") for 38 years when he died on March 1, 1960. At that time he was working under a yearly employment contract entitling him to an annual salary of $15,000 and, if he was still in the firm's employ on September 30, 1960, the end of its fiscal year, to an additional amount equal to .55% of the firm's net profits. During his employment he had required hospitalization more than 20 times and had undergone seven major operations. On many of these occasions partners of Salomon Bros. called Mrs. Carter[1] to offer financial assistance; the Carters declined, preferring to manage on their own. Most of the Salomon Bros. partners attended Mr. Carter's funeral, two having flown in from Chicago despite a blizzard. Some of the partners later suggested that the Carters' son come to work for the firm, which he did for a while.

In 1960 Salomon Bros. was managed by an administrative committee, consisting of a number of the general partners. At a meeting of this committee held shortly after Mr. Carter's death, it was decided to pay Mrs. Carter what her husband would have earned under his contract if he had lived until the end of the firm's fiscal year. These payments amounted to $60,130.84, of which $8,653.80 (paid in 15 biweekly checks of $576.92) constituted what would have been Mr. Carter's salary and $51,477.04 was what would have been his .55% share in the firm's profits.

While no minutes were kept of the administrative committee meeting at which the payments to Mrs. Carter were authorized, two members of the committee testified before the Tax Court. They agreed that at the time of Mr. Carter's death, Salomon Bros. had no established plan or policy with respect to payments to the survivors of valued employees; indeed, Mr. Carter was the first "contract employee" to have died. Both at-

---

* Of the United States Court of Claims, sitting by designation.

1. Mrs. Carter was personally acquainted with many of the partners, in part because she had served as secretary to the manager of the firm's Cleveland office from November, 1929 to December, 1932, when she married Mr. Carter.

tested to the affection and esteem in which Mr. Carter was held. One, Mr. William J. Salomon, now the managing partner, who was called by the Commissioner, testified that he felt sympathy for the widow, that this did not enter into the particular decision since "we would be sympathetic to any widow," but that, on the other hand, he doubted whether the payment would have been made if Mr. Carter had not been survived by a wife and son. He said further that, as was fairly obvious, Mr. Carter's past services were a factor in arriving at the decision. He also testified that the matter had been referred to counsel who had advised that the firm would be permitted to make the payments "and it would be treated in the same manner as if he [the employee] were still alive. . . ." Since the opinion of counsel was not produced, there is no basis for determining whether this hinged on the payments being so treated that they would constitute compensation.

Salomon Bros. did not file a withholding return (Form W-2), or withhold any income or social security taxes from the payments to Mrs. Carter. It did file an information return (Form 1099) describing the payments representing what would have been Carter's percentage share of the profits as "salaries, fees, commissions or other compensation" but,

inconsistently, did not file such a form with respect to the payments representing what would have been his fixed salary.[2]

At the end of 1960 or the beginning of 1961, the accountants who were preparing the joint income tax return of Mr. and Mrs. Carter for 1960 had a meeting at Salomon Bros. to determine how to report the payments above described. Salomon Bros. was represented by a partner, Clement J. Gaertner, Sr., who had died before the hearing in the Tax Court. Mr. Gaertner was not a member of the administrative committee but, in Mr. Salomon's words, "was the equivalent of the man in charge of back office and payments and the details, and he would talk to the lawyers and the accountants and it would be carried on from there."[3] Mrs. Carter's accountant testified that Mr. Gaertner had stated "that the payments were intended to be a gift to Mrs. Carter and they didn't know the mechanical method by which to proceed to make the gift effective." One of the accountants prepared a draft of a letter. Under date of February 1, 1961, Salomon Bros. sent the accountants a letter which we quote in the margin.[4] Mrs. Carter's accountant testified that Mr. Gaertner had said the firm would not deduct the payments as wages; since the information return of the partnership income is not in the record before

2. The record sheds no light on who filed these forms. Nothing suggests the decisions with respect to the filing were made at the partnership level. For all we know, they may have been made by a computer.

3. Mr. Salomon added that, after the administrative committee had taken a decision, they would tell Mr. Gaertner or some other partner to take care of the procedures.

4. In connection with the preparation of Dorothy T. Canter's Federal income tax return for 1960, you have asked us to furnish you with the basis upon which we made two payments of $21,448.76 and $30,028.28 to her.

Mrs. Canter's husband had been an employee of this firm for many years. He died on March 1, 1960. After a review

of his employment contract, we concluded that there was no obligation to make any post-mortem payments to Mr. Canter's estate or to his widow.

Mr. Canter had worked for us for many years and we held him in the highest personal regard. Accordingly, the partners determined to give some tangible expression to that feeling by making the above payments in his honor to his widow.

This firm does not have any established policy or plan for making payments to the widows of contract employees such as Mr. Canter. As a matter of fact, Mr. Canter's death presented us for the first time with this situation.

The letter bears Mr. Gaertner's initials. Sydney J. Carter was also known as Sydney J. Canter.

us and the Commissioner has not claimed that the payments were deducted as compensation, we assume this intention was carried out.[5]

The joint return for 1960 filed by Mrs. Carter as executrix and for herself did not report as income the payments of $60,130.84, although it did report as capital gain a payment of $52,337.68, less the deduction of $5,000 permitted by I.R.C. § 101(b) (2) (A), from the Trustees of the Salomon Bros. Profit Sharing Plan, which represented the amounts accumulated for Sydney Carter's benefit during his years of service. The Commissioner assessed a deficiency for failure to include the former amount; Mrs. Carter petitioned the Tax Court to reconsider this; that court sustained the Commissioner; and this appeal followed. We reverse.

The Commissioner expectably relies on C. I. R. v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), which included Stanton v. United States, and United States v. Kaiser, 363 U.S. 299, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960). We believe he reads somewhat more into those decisions than they held. Apart from the fact that none of the three cases involved payments to a survivor of a deceased employee, we do not understand the Court's opinion to mean that every trier of the facts was to be free for all future time to disregard guidelines that other trial and appellate courts had developed concerning the weight to be given to recurring "relevant factual elements, with their various combinations," 363 U.S. at 289, see also p. 290, 80 S.Ct. at 1199. In refusing to adopt the Government's proposal that *any* business reason for a payment would prevent it from being considered a gift, see 363 U.S. at 284 n. 6 and 287, 80 S.Ct. at 1196 and 1197, and requiring inquiry in each case into "the dominant reason that ex-

plains his [the payor's] action in making the transfer," the Court scarcely intended to sanction disregard of the teaching of one of its greatest members:

It will not do to decide the same question one way between one set of litigants and the opposite way between another.

Cardozo, The Nature of the Judicial Process 33 (1921). See also H.L.A. Hart, The Concept of Law 155–62 (1961).

When the Supreme Court decided *Duberstein, Stanton* and *Kaiser,* the Tax Court had already gone a considerable way toward structuring its position with respect to the taxable status of payments to the survivor of a deceased employee. In the often cited case of Estate of Hellstrom v. C. I. R., 24 T.C. 916 (1955), it held that payments to the widow of the president of a corporation of the amount the president would have received in salary if he had lived out the year constituted a gift. The court specifically gave no weight to the facts that the corporation took a deduction or that the gift was a function of the deceased's salary. It found the controlling facts to be that (1) the gift was made to the widow, rather than to the estate; (2) there was no obligation on the part of the corporation to make any further payments to the deceased; (3) the widow had never worked for the corporation; (4) the corporation received no economic benefit; and (5) the deceased had been fully compensated for his services. Applying a test of principal motive and thus anticipating *Duberstein,* the court found this to be a desire of the corporation to do an act of kindness for the widow. In Estate of Foote v. C. I. R., 28 T.C. 547 (1957), the Tax Court followed *Hellstrom* and found a gift in payments to the widow of the amount which her husband, a former officer of the corpora-

5. The payment was deducted in some form; the Commissioner refused to allow the rateable proportions of this reflected in the returns of the partners; the latter paid the deficiencies and have sued in the Court of Claims for refunds. The complaint describes the controversy as relating "to disallowance of deduction for the death benefits paid to the widow of Sydney J. Carter;" it also refers to the form 1099 returns described above.

tion, would have received in salary if he had lived out the year. All the factors relied upon in *Hellstrom* were present, except that the gift was made to the estate of the deceased, rather than directly to the widow. There was an additional finding that the corporation had no policy of making such payments. In Estate of Luntz v. C. I. R., 29 T.C. 647 (1958), the Tax Court held that payments to the widow of a sum equivalent to two years salary of her husband, a former president were a gift, despite the fact that at the same time the corporation also provided for the wives of two living officers at the time of their death. In finding that the payments were a gift, the Tax Court repeated the five factors noted in *Hellstrom.*

Despite the fact that *Duberstein* had approved the substantive test applied in *Hellstrom* and *Luntz,* the Tax Court took an abrupt swerve in Estate of Pierpont v. C. I. R., 35 T.C. 65 (1960), decision of which had been postponed pending the Supreme Court's decision in *Duberstein* and which was reviewed by the full court. The majority, seeing in the Supreme Court's summarization of older cases an indication, not perceptible to us, that the Court was adopting a more restrictive notion of what constitutes a gift, found payments to a survivor to be income, despite the presence of the five factors held in *Hellstrom* and *Luntz* to point to a gift, because of the authorizing resolution's having used the phrases "in recognition of the services rendered," a factor obviously present in every such case—whether mentioned or not—and having described the payment as "a continuation" of decedent's salary, as the payments held to be gifts in *Hellstrom, Foote* and *Luntz* had also been, and of the absence of "solid evidence" that the payments "were motivated in any part by the widow's needs or by a sense of generosity or the like." 35 T.C. at 68.

The Tax Court's decision in *Pierpont* was reversed and remanded by the Fourth Circuit, Poyner v. C. I. R., 301 F.2d 287 (4 Cir. 1962). Chief Judge Sobeloff, writing for a strong court, said, *id.* at 291–292 (footnote omitted):

> In every prior Tax Court case, essentially identical facts were held sufficient to support the conclusion that the dominant motive was sympathy for the taxpayer's widowed position. The only evidence on which the Tax Court specifically relies for its contrary finding is the wording of the authorizing corporate resolutions. While the language of the resolutions certainly merits consideration, never before has such language been deemed sufficient by itself, and in the face of the other above specified factors, to support a finding that the payments were compensation for services rendered. As the facts stipulated in this case do not differ from those deemed conclusive in past cases, a contrary finding seems to us without warrant.

> The Supreme Court in Duberstein did not destroy the authority of the earlier Tax Court cases and the guides enunciated in them for discovering motivation.

After summarizing *Duberstein,* the opinion continued, *id.* at 292 (footnoes omitted):

> On the other hand, Duberstein cannot be read as limiting inquiry by the trier of fact solely to the factors recognized by the earlier decisions. The objective is to discover which motive is dominant in a field of co-existing motives. In the task of sorting out the varying motives, the development of more reliable criteria by the triers of fact should not be curtailed. Indeed, the Tax Court since Duberstein has considered it necessary to inquire into the widow's stock holdings in the company and the knowledge or lack of it on the part of the Board of her financial status following the death of her husband. The Tax Court in the present case also seems to have thought that the directors' knowledge of "the widow's needs" was an important factor. These subjects are certainly relevant, and inquiry may properly be

directed to them, and whatever other factors the trier of fact might think helpful.

As the record was silent with respect to these further factors, the court reversed in order to permit the parties to supplement it.

Since *Pierpont* the Tax Court seems to have found almost uniformly that payments to survivors constituted income. We pass for later discussion two cases in which it suffered reversal. In Westphal v. C. I. R., 37 T.C. 340 (1961), appeal dismissed, 317 F.2d 365 (8 Cir. 1963), it again relied on the characterization of the payment as a partial continuation of salary, and on the deduction taken by the corporation as salary. In Evans v. C. I. R., 39 T.C. 570 (1962), aff'd, 330 F.2d 518 (6 Cir. 1964), reliance was placed on the widow's favorable financial condition, the family control of the corporation, and the taking of a deduction as "widow's compensation." In Cronheim's Estate v. C. I. R., 20 CCH Tax Ct. Mem. 1144 (1961), aff'd, 323 F. 2d 706 (8 Cir. 1963), the resolution referred to continuation of payment of salary to the widow for the balance of the fiscal year and there was evidence that the company had followed a similar practice in the past, so that "it is a reasonable conclusion that such an officer would expect that his survivors would similarly be accommodated." We add references to other Tax Court cases in the margin; [6] with a single partial exception, all payments were found to be income. While in most instances there were special factors making the conclusion plainly correct, in others, notably the *Doumakes* case, the decision seems in clear conflict with *Hellstrom* and *Luntz;* the effect of *Pierpont,* doubtless inevitable in light of the review of reports of a single judge by the Chief Judge of the Tax Court with a view to maintaining consistency, I.R.C. § 7460(b), has been to establish what amounts in that court to a rule that, in the absence of unusual circumstances demonstrating compassion, all payments to survivors of deceased employees are considered to be compensation.

---

**6.** Estate of Cooper v. C. I. R., 20 CCH Tax Ct.Mem. 774 (1961) (salary continuation for two years; family owned all the stock); Smith v. C. I. R., 20 CCH Tax Ct.Mem. 775 (1961), aff'd, 305 F.2d 778 (3 Cir.), cert. denied, 371 U.S. 904, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962) (payments of about $50,000 over two years); Fisher v. C. I. R., 20 CCH Tax Ct.Mem. 318 (1961) (corporation stated payment was intended as extra income to promote officer security); Estate of Russek v. C. I. R., 20 CCH Tax Ct. Mem. 123 (1961) (payments voted for several officers before any of them had died); Estate of Doumakes v. C. I. R., 22 CCH Tax Ct.Mem. 1247 (1963) (family control of the corporation, but widow clearly in need and payment was made in direct response to her plight, with no prior history of such payments); Dickson v. C. I. R., 23 CCH Tax Ct.Mem. 1161 (1964) (widow had substantial stock holdings and was well off; resolution called payments a pension); Maltzman v. C. I. R., 23 CCH Tax Ct.Mem. 829 (1964) (payments for five years where widow held all the stock as trustee, and she, along with her three children, made up the Board of directors); Estate of Cross v. C. I. R., 23 CCH Tax Ct.Mem. 1542 (1964) (some payments characterized as salaries, others as pensions; closely held corporation, with two-thirds of the stock held, either directly or for the benefit of the widow, who was independently wealthy; viewed by corporation as a "nice gesture;" no prior payment of this type); Estate of Enyart v. C. I. R., 24 CCH Tax Ct. Mem. 1447 (1965) (lump sum payment of $10,000 to widow found to be a gift, but five $1,000 payments held to be income; $10,000 payment made out of grief for the deceased who had died in a plane crash and concern about the great loss the widow had suffered; $1,000 payments characterized by the corporation as "payment of termination compensation to surviving spouse"); Joyce v. C. I. R., 25 CCH Tax Ct.Mem. 914 (1966) (specific fund set aside for such payments, which were made in every case, and widow's individual needs were never considered); Estate of Schwartz v. C. I. R., 26 CCH Tax Ct. Mem. 957 (1967) (resolutions framed in terms of additional compensation to the deceased and company repudiated any gift characterization when its own tax deduction was at issue).

As previously noted, the Tax Court's finding of income has been upset in two cases since *Poyner*. The Sixth Circuit reversed in Kuntz' Estate v. C. I. R., 300 F.2d 849 (6 Cir.), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962), in which the Tax Court had relied on its *Pierpont* opinion. The court of appeals did this although the corporation was a family company and the resolution referred to the payment of the former salary for an additional year "as additional compensation and in consideration of services heretofore rendered . . .," since two directors testified that the intention was to make a gift. The Eighth Circuit reversed in Olsen's Estate v. C. I. R., 302 F.2d 671 (8 Cir.), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed. 2d 165 (1962), where, in a pre-*Duberstein* decision, the Tax Court had found a lump sum payment to be income, although the authorizing resolution did no more than acknowledge the decedent's valuable services, the president of the corporation testified the board had thought that a payment to the widow "was in order" and "she probably could use the money under those circumstances," and the company claimed the payment as a deduction, not for compensation, but under the heading "Other Deductions."

The course of decision in the district courts has been quite different from that in the Tax Court.[7] Payments to a survivor, not specifically characterized as compensation, have been rather consistently held to be gifts except when the corporation was dominated by the decedent's immediate family or there was a plan, formal or informal, for making such payments. In United States v. Kasynski, 284 F.2d 143 (10 Cir. 1960), the court affirmed a decision of a district judge,[8] rendered before *Duberstein*, holding the payment of an amount equivalent to two years salary, under circumstances remarkably parallel to those in the instant case, to be a gift. In United States v. Frankel, 302 F.2d 666 (8 Cir.), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed. 2d 165 (1962), the court affirmed a district court's holding that payments to a widow of what the deceased would have received in salary and bonus for the rest of the year (February through December) was a gift, the court emphasizing that the company had no policy for payments of this type. In United States v. Pixton, 326 F.2d 626 (5 Cir. 1964) (Wisdom, J.), the court affirmed a ruling that payments of one-half of the deceased's former salary were a gift, although the corporation, in an effort to protect its deduction, wrote the widow that the payments were not intended to be a gift but rather some form of salary continuation. Our own case of Fanning v. Conley, 357 F.2d 37 (2 Cir. 1966), affirmed a finding of a gift where a corporation had paid the widow an amount equal to a half year's salary "as a salary continuation," the payments were charged to "miscellaneous expense" and a tax deduction was claimed under the heading "Other Deductions"—despite evidence that this was not the first payment to a survivor.[9] Where courts of appeals have affirmed district courts' findings of income[10] or

7. We omit discussion of cases tried to a jury since the reports generally do not give sufficient facts.

8. Hon. Sylvester J. Ryan, of the Southern District of New York, sitting in the District of Colorado by designation.

9. Another court of appeals decision affirming a district court finding of a gift, is Greentree v. United States, 338 F.2d 946 (4 Cir. 1964)—a rather extreme case since the widow and her sons owned all the stock of the corporation.

10. Gaugler v. United States, 312 F.2d 681 (2 Cir. 1963) (consistent record of similar payments made for "good public relations" and testimony by officers that they were almost afraid not to make them; payments recorded as executive salaries); Froehlinger v. United States, 331 F.2d 849 (4 Cir. 1964), aff'g, 217 F.Supp. 13 (D.Md.1963) (similar payments to widows of all previous officers; testimony that corporate officers felt obligated to make payments in view of this).

reversed their findings of gift,[11] the facts have been far more favorable to the Government than here. We set out in the margin a substantial sampling of decisions by courts of first instance.[12–13] Quite obviously, the Tax Court and the district courts have been traveling different paths.

11. Tomlinson v. Hine, 329 F.2d 462 (5 Cir. 1964) (established policy of making such gifts to further employee and client relations); Fritzel v. United States, 339 F.2d 995 (7 Cir. 1965) (discernible pattern of previous payments; testimony that main interest was in employee morale; officers believed widow did not need assistance).

12. *Holding payments to be gifts:* Cowan v. United States, 191 F.Supp. 703 (N.D.Ga.1960) (all *Hellstrom* factors present and no plan for such payments); Vaughn v. United States, 62–2 U.S.Tax Cas. 85,800 (S.D.Ga.1962) (all *Hellstrom* factors present); Schwarz v. United States, 62–2 U.S.Tax Cas. 85,917 (N.D. Tex.1962) (all *Hellstrom* factors present); Corasaniti v. United States, 212 F.Supp. 229 (D.Md.1962) (two years continued payment of salary; company took deduction as "Deceased Employees' Salaries Paid to Wives"); Taylor v. United States, 62–2 U.S.Tax Cas. 86,319 (E.D.Tenn.1962) (no evidence of a plan to make such payments; board of directors family-controlled; finding that payments were made out of concern for the widow); Schleyer v. United States, 63–2 U.S.Tax Cas. 89,223 (E.D.Mo.1963) (payments to widow of $10,000 for twelve years, or until widow died or remarried; other payments to widows had been made, but only sporadically, on consideration of each case); Falk v. United States, 277 F.Supp. 129 (C.D.Cal.1967) (sum equivalent to annual salary; company attempted to take deduction as an ordinary and necessary business expense); Biedenharn v. United States, 300 F.Supp. 1013 (W.D.La.1969) (continued payment of year's salary by family corporations); Childers v. United States, 69–2 U.S.Tax Cas. 85,889 (M.D.Tenn. 1969) (payments by family corporations had been made previously to the widows of other family members; evidence that boards of directors specifically considered widow's plight); Harper v. United States, 314 F.Supp. 360 (C.D.Cal.1970) (although similar payments had been made in many cases).

If Mrs. Carter had paid the tax here at issue and sued for a refund, the odds that a district court would have found the payments constituted a gift would thus have been overwhelming. If it had done so, Fanning v. Conley, *supra,* 357 F.2d 37, is proof positive that we would have affirmed. Not content with reli-

13. *Holding payments to be compensation:* Carson v. United States, 317 F.2d 370, 161 Ct.Cl. 548 (Ct.Cl.1963) (payments of $272,000 over 18 years; widow held one-third of corporation stock and she and her brother-in-law constituted a majority of the board of directors); Landry v. United States, 227 F.Supp. 631 (E.D. La.1964) (payments to the widow of what husband, who died in November, would have received in salary and bonus if he had lived out the year; long-standing policy and formula for making such payments; president testified that if employee had died in, say, February, rather than in November, widow would not have received the bonus); McCarthy v. United States, 232 F.Supp. 605 (D.Mass.1964) (resolution authorizing payment stated that there was company policy to make these); Spear v. Vinal, 240 F.Supp. 33 (D.Neb.1965) (payment of one year's salary; officer testified that he could see "no other reason" for the gift other than "esprit de corps"; previous pattern of such gifts which were deducted from the corporation's books as a salary expense); Meyer v. United States, 244 F. Supp. 103 (S.D.Cal.1965) (payment of half year's salary; unwritten but discernible policy to make such payments as a "good will benefit to the corporation"); Security First National Bank v. United States, 66–2 U.S.Tax Cas. 87,058 (S.D.Cal.1966) (well-established policy of such payments which were considered to be of economic benefit to the corporation in helping increase loyalty of executives); Prather v. United States, 296 F.Supp. 1323 (N.D.Tex.1969) ($40,000 payment, twice husband's annual salary; widow and son elected corporate officers at same meeting as authorization of payment; testimony that figure was calculated on basis that decedent had worked twice as long and had twice the salary as previous officer whose widow had received $20,000; no evidence of widow's need); Fitch v. United States, 299 F. Supp. 1170 (D.Kan.1969) (long history of such payments said to be made because they created "esprit de corps" and generated "loyalty, diligence and efficiency").

ance on the "unless clearly erroneous" rule, F.R.Civ.P. 52(a), we went to pains to point out for the guidance of the district courts that the very factors here principally relied upon by the Commissioner to negate the inference of gift—the references to salary continuation, the deduction of the payment as a business expense, although not as compensation,[14] and the failure to investigate the widow's financial circumstances—"should not be the controlling or determinative factor," 357 F.2d at 41. Indeed, on the last item Mrs. Carter stands rather better than did Mrs. Fanning, in light of Salomon Bros.' knowledge of the heavy costs entailed by her husband's many hospitalizations.[15] We cannot believe the Supreme Court intended that, at least in an area where, in contrast to the entire field of controversy with respect to gifts versus compensation, similar fact patterns tend to recur so often, the result should depend on whether a widow could afford to pay the tax and sue for a refund rather than avail herself of the salutary remedy Congress intended to afford in establishing the Tax Court and permitting determination before payment.[16] The "mainsprings of human conduct," 363 U.S. at 289, 80 S.Ct. 1190, do not differ so radically according to who tries the facts.

■ Beyond all this, we join in Chief Judge Sobeloff's belief, expressed in Poyner v. C. I. R., *supra*, 301 F.2d at 291–292, that when the Supreme Court wrote as it did in *Duberstein*, it could reasonably have expected the Tax Court to continue to observe the sensible guidelines last enunciated in Luntz v. C. I. R.,

29 T.C. 647, 650 (1958), supplemented by such others as experience should prove to be relevant, as aids to determining "the dominant reason that explains his [the payor's] action in making the transfer," 363 U.S. at 286, 80 S.Ct. at 1197. Each of the factors mentioned in *Luntz* as pointing to a gift is present here unless the one reading "the wife performed no services for the corporation" were to be read to include services that had ended 28 years before her husband's death, a construction that is patently unreasonable. If anything, Mrs. Carter's previous employment and her consequent acquaintance with Salomon Bros. partners tend in favor of the inference of a gift. The only factors mentioned in the judge's opinion as calling for a different result here than in *Luntz* are (1) the claim of a tax deduction by the payor, which the Supreme Court in *Duberstein*, see fn. 14, this court in *Fanning*, and the Tenth Circuit in *Kasynski*, have held to be without material probative significance; (2) the alleged failure to inquire into Mrs. Carter's financial condition, which was unnecessary in light of what the firm knew; (3) the reference to continuation of Carter's salary as a measure of the payment, a factor present in the great bulk of these cases and ruled by us not to be material in *Fanning, supra,* 357 F. 2d at 41; and (4) the filing—by someone not identified, see footnote 2—of a form 1099 return with respect to the bonus portion of the payment. This last factor was outweighed by the inconsistent failure to file such a form with respect to the salary portion and the failure to denominate the payments as compen-

---

14. The Supreme Court instructed in *Duberstein* that courts should give little or no weight to "the peripheral deductibility of payments as business expenses," since such an inquiry "would summon one difficult and delicate problem of federal tax law as an aid to the solution of another." 363 U.S. at 288, 80 S.Ct. at 1198. Cf. 4A Mertens, Law of Federal Income Taxation, § 25.85 (1966 ed.).

15. Mrs. Carter's testimony that the family was almost totally dependent on her husband's salary is verified by the fact that the joint income tax return shows

1960 dividend and interest receipts of only $1,272.28.

16. For a further discussion of the inconsistent results between the tax court and the district courts in this area, and the resulting forum shopping for litigants who can afford it, see Note, Payments to Widows of Corporate Executives and Employees—Gifts or Income?, 49 Va.L.Rev. 74, 123 (1963); Note, Voluntary Payments to Widows of Corporate Executives: Gifts or Income?, 62 Mich.L.Rev. 1216, 1227–31 (1964).

sation in the partnership return. Moreover, the judge was in clear error in regarding Mr. Gaertner's oral statement and the firm's letter of February 1, 1961, see fn. 4, as of "only slight probative value." When intention is at issue, a declaration about it by a person having knowledge of the fact is not excludible simply because it was made sometime after the event. McCormick, Evidence § 269 (1954). While Mr. Gaertner was not a member of the administrative committee, he had been informed of its action and entrusted with the responsibility of carrying this out. Moreover, his statements were contrary to the firm's selfish interests, since its case for a deduction—on the merits of which we do not pass—would have stood better if the payments to the widow were in fact added compensation for Mr. Carter's services. His statement that a gift was intended is very nearly as probative as the testimony of the two directors on which the Sixth Circuit relied for reversal in *Kuntz, supra,* 300 F.2d 849. We see nothing to the contrary in Mr. Salomon's testimony, so heavily relied on by the dissent. Called as a witness by the Commissioner, he in no way denied the intention was to make a gift, although motivated by Mr. Carter's past services.

We perceive no tenable distinction between the facts of this case and those that led the Eighth Circuit to reverse the Tax Court in Olsen's Estate v. C. I. R., *supra,* 302 F.2d 671. We think the facts here are more favorable to the taxpayer than those that led the Sixth Circuit to do the same in Kuntz Estate v. C. I. R., *supra,* 300 F.2d 849. On the other hand, we do not believe that reversal here would be inconsistent with any of the decisions by courts of appeals or the Court of Claims which we have discovered. Applying the criterion of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948), approved for use in this context by the Court in *Duberstein,* 363 U.S. at 290–291, 80 S.Ct. at 1199–1200, we are "left with the definite

and firm conviction that a mistake has been committed."

The judgment is reversed, with instructions to enter judgment annulling the determination of a deficiency.

DAVIS, Judge (dissenting):

Chief Judge Friendly's comprehensive opinion demonstrates at least these two things: first, that since Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), there has been a perhaps unfortunate variety of judicial answers to the question whether payments to survivors were compensation or gifts, and, second, that in this case the trier of facts could have come to the other conclusion as many other judges probably would. Nevertheless, I depart from the court because the standards set by the Supreme Court, in delineating the roles of trier and reviewing tribunal, seem to me to call for affirmance of the Tax Court's result here, regardless of what we or some others would do as fact-finders.

*Duberstein* stressed that "appellate review of determinations in this field must be quite restricted", confirmed "that primary weight in this area must be given to the conclusions of the trier of fact", and pointed out that the "clearly erroneous" rule "applies also to factual inferences from undisputed basic facts", 363 U.S. at 289–291, 80 S.Ct. at 1199. The opinion characterizes the trier's own determination as factual, directs that it "be reached on consideration of all the factors" and by "application of the fact-finding tribunal's experience with the mainsprings of human conduct [as well as the "data of practical human experience" and "informed experience with human affairs"] to the totality of the facts of each case", and invokes the analogy of Mr. Justice Cardozo's poetic description of "ordinary and necessary" as "a way of life" as well as a "riddle" to which "[l]ife in all its fullness must supply the answer." 363 U.S. at 288–290, 80 S.Ct. at 1198. See, also, pp. 287, 292, 80 S.Ct. pp. 1197, 1200. Conversely, the Court specifically refused to promul-

gate subsidiary rules of law, more detailed than these general criteria. 363 U.S. at 287–289, 80 S.Ct. at 1197–1199. These expressions, both in words and in spirit, add up to the directive that, on appeal, heavy reliance must be put on the factfinder's sense of the gestalt of the particular transaction—the "over-all inference", as the Court puts it, 363 U.S. at 287, 80 S.Ct. at 1198—the total configuration from which is drawn the employer's "dominant reason" for making the payment.

The Court's discussion also envisaged, expressly, that these general and "non-technical" standards, applied "on a case-by-case basis" "in the variety of forums in which federal income tax cases can be tried", could possibly lead to a lack of "tidiness, symmetry and precision" and some "diversity of result"—just as any "system based on the determinations of various fact-finders" can do. 363 U.S. at 289, 290, 80 S.Ct. at 1198–1199. But it thought that this risk was implicit in the existing statutory scheme, and could be remedied, "if there is fear of undue uncertainty or overmuch litigation", by Congress should it choose to "make more precise its treatment of the matter." *Id.* I can only conclude from these pages of *Duberstein* that the Supreme Court deliberately acknowledged the chance of the very contrariety-of-opinion which this court now deplores, and left the cure to the legislature.

The Tax Court below canvassed all the significant factors which have been mentioned as bearing on the issue [1] but felt that the taxpayers had failed, on "conflicting evidence", to sustain their burden of showing that the employer had made a gift.[2] Given *Duberstein's* accent on the trier's role and special function, I do not have the necessary "definite and firm conviction that a mistake has been committed" on this record. The testimony of William Salomon, managing partner of the employer, is especially damaging to the taxpayer.[3] He said, in

---

1. In Poyner v. C.I.R., 301 F.2d 287 (1962), the Fourth Circuit sent the case back to the Tax Court to take account of all relevant factors.

2. The court also said: "If the burden of proof in this case had been upon the respondent [appellee], a different result would be required."

3. "Q. At the administrative committee meeting immediately following Mr. Carter's death was any decision made as to a continuation of his salary? A. It was our desire to continue this salary, yes, sir.

Q. Would it be a fair statement that fifteen checks represent a continuation? A. Whatever was left for the balance of the fiscal year.

Q. His salary was continued to the end of the partnership's fiscal year? A. Yes, sir.

Q. The record in this case also shows that during the year 1960 Salomon Bros. drew two checks to the order of Mrs. Carter in the amounts of $21,448.76 and $30,028.28 respectively. Do you recall any discussion taking place in the administrative committee regarding these payments? A. The discussion was prior to these payments of our desire to continue through the fiscal year salary and share of profits. I assume that these two payments were the share of profits, not the payment that was mentioned before which was a profit sharing plan which would be automatic. At that time, of course, we didn't know what the figures would be.

Q. Would you say it is a fair statement that the administrative committee decided to continue Mr. Salomon's salary— A. Mr. Canter, sir. [Carter was also known as Canter]

Q. I'm sorry, Mr. Canter's salary to the end of the year, and to pay him what he would have earned under the profit sharing arrangement had he lived to the end of the year? A. Yes, sir. That is true.

Q. In arriving at these decisions, were Mr. Carter's services to the company a factor in arriving at this decision? A. Without question.

\* \* \* \* \*

Q. Mr. Salomon, I believe you testified that the administrative committee referred the decision to make these payments to Mrs. Carter to its counsel. A. Yes, sir.

Q. Did you receive a reply from your counsel rendering an opinion as to these payments? A. We did.

Q. Would you indicate what the opinion of counsel was? A. The opinion of counsel was that we would be permit-

particular, that "the opinion of counsel was that we would be permitted to make these payments and it would be treated in the same manner as if he [Mr. Carter] were still alive, or as an employee would be considered exactly as far as the tax implications were concerned."

The trier had this oral evidence of Salomon Bros.'s most significant agent (for this purpose), together with the other, minor indications favoring the Service.[4] There were, of course, substantial considerations supporting the taxpayer, but the trial judge was privileged to balance them comparatively and discount their importance. Unlike the court, I think, for instance, that the factfinder could (though he did not have to) downgrade the firm's post-transfer statements as to its intention; the admissibility of these declarations does not require the trier to give them much weight when he is more persuaded by other evidence closer to the transfer.

*Duberstein* thrice directs the trial judge to the "totality of circumstances in the case", "consideration of all the factors", "the totality of the facts of each case" (363 U.S. at 287, 288, 289, 80 S. Ct. at 1198), and thrice sanctions his use of "experience with the mainsprings of human conduct", "the data of practical human experience", "informed experience with human affairs." 363 U.S. at 289, 292, 80 S.Ct. at 1198, 1200. Whatever I might have done myself, I cannot

say that here the judge was clearly wrong in his evaluation of the totality, in the light of informed and practical experience.

There remains to say only that, for me, the *Duberstein* teaching, insisting on the totality of the individual facts, reduces the impact of decisions by other courts on what are necessarily other factual patterns. In the only two rulings reversing outright a Tax Court holding of taxability (Kuntz v. Commissioner of Internal Revenue, 300 F.2d 849 (6th Cir. 1962) and Olsen's Estate v. Commissioner of Internal Revenue, 302 F.2d 671 (8th Cir. 1962)), there was no live and explicated testimony like that of William Salomon, but, at most, merely formal and summary indications in the authorizing resolutions that the payments were regarded as compensation.[5] Affirmances of a trier's finding of a gift, like Fanning v. Conley, 357 F.2d 37 (2d Cir. 1966), are, it goes without explanation, in quite a different class. As for the implied suggestion that the Tax Court should, in a case like this, bow to the assumed trend in the district courts, I see two obstacles: first, that nothing in the federal model of tax-determination sets one group of triers above another; and, second, that *Duberstein* contemplated lack of "symmetry" between "the variety of forums in which federal income tax cases can be tried" (363 U.S. at 290, 80 S.Ct. at 1199).

---

ted to make these payments and it would be treated in the same manner as if he were still alive, or as an employee would be considered exactly the same as far as the tax implications were concerned.

\* \* \* \* \*

Q. Were the payments to Mrs. Canter deducted on the partnership return? A. They were."

4. The filing by the firm of the information return (Form 1099); the firm's claiming

of a tax deduction (though not for compensation paid); the failure to inquire into Mrs. Carter's financial status; the measurement of the payment by the exact amounts Mr. Carter would have earned if he had remained alive.

5. The same is true of Poyner v. Commissioner of Internal Revenue, 301 F.2d 287, 291–292 (4th Cir. 1962).